This is scheduled for oral argument this morning, and for the benefit of the attorneys who are arguing today, when you approach the lectern, when it's your turn, would you please enter your appearance, state your name, and who you represent clearly, that way the audio record will be clear and you'll be identifiable for the interested public. With that, we'll hear the first case, docket number 2007-1261, IMS Engineers v. Army. Mr. Camardo? Good morning, your honors. I'm Joseph Camardo for the appellate IMS Engineers and Architects PC. The basic nature of the case is an appeal from a decision of the Armed Services Board of Contract Appeals denying IMS's appeal. And there was three issues before the ASPC at the time. A breach of an IDIQ contract, that the government abuses discretion in terminating that contract either in bad faith, and that the government exercised bad faith with respect to exercising the last couple of years of the option. Now, the board basically ignored the breach of the IDIQ contract, and that's pretty much one of the major issues I want to address. I mean, our briefs are pretty comprehensive. They go into the bad faith termination. They go into the abuse of process and not exercising the option. Can I, just on that point, maybe you're going to get to this. Am I correct that your theory that there was a contract is predicated on the fact that your client at the end of the day said, I'll accept any amount you want? And so his view is that there was an agreement based on that? Well, your honor, that's one of the points the board addressed, but we've got to take a step back. The step back I want to take is there was an IDIQ contract to begin with. And that's the point that the ASPC appears to have missed. And in that IDIQ contract, there was a set-aside contract for 8A contractors with all kinds of special terms and conditions. And what arose out of that was a- But at what point does your client contend that he and the government entered into an agreement? The point where he basically left the negotiations. He wrote a letter basically saying, I'll agree to what you want. And the contracting specialist with the authority to negotiate the contract testified, which the board ignored in their briefs or in their decision. The contract specialist testified that there was an agreement and that there would be a notice to proceed was going to be issued. So she was very clear in her testimony. And the board totally discredited and discounted that. But I guess the problem I'm having is what seems to be your view, which is you had a contract because your client said, I'm willing to accept whatever you all agree to. And that constitutes the contract. But at the time, am I wrong that he made that offer? There was no identified subcontractor? Well, again, what we're dealing with here is a delivery order being issued under the IDIQ contract. You already had a contract. No, but why don't you just answer my question first, which is at the time he made that offer, was there an identified subcontractor? There was an identified subcontractor, but there was never a formalization of that subcontractor. There were storm negotiations. So my concern, one of the questions that arises is doesn't the government have the right to satisfy itself when it reaches an agreement with the contractor that he's able to perform the contract? And at that point in time, how could the government have satisfied itself that that was the case? Well, my response to that, Your Honor, is a very good question. The point being is that the government wanted Black & Veatch. It was a large contractor. The IDIQ contract basically says that you can't subcontract out more than 50%. Don't forget this contract was issued to the SBA to begin with, the IDIQ contract. There's very stringent regulations on an 8A contract. And what the Corps was doing, because Black & Veatch had exceeded their maximum, they were already out at the site, the customer, March Air Force, basically the Corps was administering the contract for, wanted Black & Veatch. So my client basically was dictated by the Corps to use Black & Veatch, and that's what he proposed. And basically that was a violation of the regulations. It was a violation of everything the 8A contract stands for. Then what came to pass is that he was instructed, he had subsequent conversations with a small business liaison officer, and he says, basically, I don't like what's going on there. And it came to pass that that contract was renegotiated. In other words, he wanted to do all the work himself, which he was basically entitled to do. The Corps couldn't dictate, the Corps couldn't maintain any designation over who was going to be utilized here. So he tried to negotiate with the Corps, renegotiate the contract for him to do all the work, IMS to do all the work out at this site. And the Corps basically took the position, well, your costs are too high. Well, my client basically took the position, well, I'll agree to what you want to give me. You've got a government estimate. I'll agree to that government estimate. And I'll go along with that. And he left those negotiations. He wrote a letter confirming those negotiations. And Ms. Overgaard, who was in charge of the negotiations, basically testified that there was an agreement, that they were ready to go forth with him. And that's the testimony that the Board completely ignored, and that all they were going to do was they were in the process of issuing a notice to proceed. They were in the process of issuing that notice to proceed. So there was an agreement for my client to do the work. But it seemed to me that there was at least some conflicting evidence in the record on that point. Was there not? Well, the evidence that was conflicting was Mr. Lynn Bruner, who was just a project manager. He was basically testifying for Ms. Overgaard. Now, when Ms. Overgaard testified, she very clearly stated that we thought an agreement had been reached and we were getting ready to send out the notice to proceed. In the interim, Mr. Lynn Bruner, on his own, started this termination process. Wasn't there some evidence in the record to indicate that the government was not fully satisfied that, even though your client seemed to be willing to accept whatever payment terms the government deemed appropriate, that the government wanted assurances that actually the work was going to be performed, that that represented the number that Mr. Singh agreed to accept, represented compensation for work that was actually going to be performed, and that there was some uncertainty as to whether that was simply an effort to sort of appease the government at any cost without any assurance that the work would be performed? Well, there are different degrees of that. I don't think Mr. Singh ever represented he was going to do it for a dollar like Mr. Lynn Bruner wanted the Board to believe. The point being that he was willing to go along with Mr. Lynn Bruner's numbers, and Mr. Lynn Bruner had some good numbers. He just didn't throw numbers out there to begin with. But the point being, Your Honors, it's all well and good, but the person in charge of the negotiations, the point that the Board totally fails to see, the person in charge of the negotiations, Overgaard, this is Overgaard, not Mr. Lynn Bruner. Mr. Lynn Bruner is just a project manager. Overgaard works for the contract now. She's got the authority. She testified. An agreement was reached, and we were getting ready. We were in the process of issuing a notice to proceed. Where is her testimony in the record? Just give me a minute around. I'll have to find it. It would be at page 16 of our briefs. It would be page 16 of the briefs citing to 331 through 338. 331 through 338. That's Mr. Haskell, and Overgaard would be at A319. 319. What exactly is that testimony? Okay. It seems to me there is some testimony spanning 318 and 319 that says, well, yeah, I don't remember specifically coming to an agreement. I can only tell you that I know we have a signed task order for them to do it, and I have the documentation in the file saying we came to an agreement. Is that what you're referring to? Yes. Is there anything else, or is that the extent of it? My trouble is that I understand what you're saying. And if we were a trial court hearing this case in the first instance, maybe we would come to a different conclusion. But we're not. We're a court of review, and your burden was to establish, by clear and convincing evidence, that there was some sort of bad faith, and our review is substantial evidence. So you've got a sort of double-barreled hurdle to get over. See, that's where I disagree with Your Honor with all due respect. The bad faith would go into the issue of whether or not the termination was done properly. The bad faith would go into whether or not you didn't exercise the option. But don't forget, you already had a contract, an IDIQ contract. Now, you know, the Federal Circuit has come out and kind of distinguished between those two a little bit. You've got bad faith leading to something which you don't have. But when you do have something, there's this breach of the implied duty of good faith and fair dealings, not to block or suffocate or make things up. So it's a lot lower of a standard. It's almost a preponderance of the evidence standard. So that's what the Board missed. The Board basically said that we don't have jurisdiction over that issue, when, in fact, they did have jurisdiction over that issue. So we had an IDIQ contract to begin with, Your Honors, a delivery order against an IDIQ contract. You already had the contract in being. You already had stringent 8A regulations. The work was already set aside in the 8A program. The question is whether the delivery order was fully renegotiated and was in place. Well, the question would be there, okay, under the IDIQ contract. Everything, all the actions and inactions that the court took under that IDIQ contract, leading, okay, to the issuance of the delivery order number three, leading to who they should utilize, leading to the fact that they were violating the 50% rule, going down through all of that stuff, even getting the work out of that 8A program or out of the 8A contract. Those are all breaches of the implied duty of cooperation not to hinder or prevent performance. Now, you know, even if you didn't get into this agreement, you still come down the path here that when they issued determination for guineans, Mr. Lindgren wrote a memo basically saying, well, you know, the reason why that didn't happen was because the notice proceed, okay, well, the reason why it didn't happen is because that IMS could not do their work, okay, which is not true. You know, we had a change in the contractor, subcontractor status, and he also said that there was a change in circumstances at the site, and that's not true. You're into your rebuttal, but let me ask you a question, and we'll give you a little bit more time. I have a question about the notion that your client was obligated to use B&B in the first instance, and I know your client testified to that effect, that there was a phone call, and that that was made clear to him right at the outset. Then we have this conflicting testimony about subsequent discussion with regard to a recommendation of different possible subcontractors. And my question is this. I understand that Mr. Mercier, who is the one who supposedly made that first call or was the recipient of the first call, I forget who called who, but he was actually there in the courtroom at the time. That's correct. But you didn't call him as a witness. I didn't. I wasn't a trial attorney at the time, Your Honor. But the government, you know, in response to that, if Mr. Singh testified that he received a phone call and Mr. Mercier is in the courtroom, you would expect the government to call Mr. Mercier to rebut what Mr. Singh said. Maybe, and even though there's no requirement for corroboration, and to that extent the Board may not have been correct. But nonetheless, it certainly would have helped your case to have his testimony corroborate what Mr. Singh testified. But corroboration, okay, is just not that testimony. So there's a lot more corroboration in the record. We got corroboration that B&V exceeded the limits of its contract. We got corroboration that the customer, March Air Force Base, wanted B&V. We got corroboration that the Corps of Engineers wanted to accommodate its customer. We got corroboration that they're already in negotiations with B&V. We got corroboration basically that B&V had already discussed the prices with the Army Corps of Engineers, and that they had come to some sort of agreement on it. We got Mr. Lindbrunner's own records basically saying if you don't use B&V, we're going to terminate that contract. So there's a lot of corroboration there. You just can't parse this thing with Mr. Mercier saying, well, Mr. Singh said this, but he didn't call Mr. Mercier, and that's the end of the issue. All right. Thank you. And we get your point. We'll reserve four minutes for rebuttal. We'll hear from the government. Ms. Steniford, good to see you again. May it please the Court, I'm Joan Steniford on behalf of the United States. The appeal here fails because the appellant has failed to meet the appellate test for reversing factual findings. It's clear that the appellant disagrees with the Board's view of the evidence, but what the appellant has failed to do is to give this Court any basis on which to challenge or reverse those findings. Well, just following up on Judge Lind's point that he concluded with, if you have testimony of Mr. Singh and you have corroboration that a conversation took place, that's not contested. I mean, the government had the opportunity to put in the other person to the conversation to say it didn't take place, but in the absence of any other evidence, why isn't that sufficient? Why isn't that a problem, even under the standard of review we have up here? Well, the problem, Your Honor, isn't whether the evidence could support a different conclusion than the Board reached. The problem is whether the conclusions that the Board did reach are, in fact, supported by substantial evidence. So where's the substantial evidence to support that the conversation with respect to Mr. Mercier didn't say what he was alleged to have said? Which is that B&V had to be... Well, I think the whole notion that B&V was a required subcontractor by the government has been elevated beyond its actual importance. In its initial response to the request for proposals, IMS engineers proposed using B&V. That was the basis on which the delivery order number three was awarded to IMS. That was before the alleged conversation with Mr. Mercier? Yes. That was the basis. And then, for whatever reason, IMS couldn't come to terms with B&V as a subcontract, and so proposed, well, we'll just do the work ourselves. IMS, we won't use a subcontractor. And then the problem that was discussed during the penalty argument arose that no sensible cost proposal was ever submitted. So whether the government wanted to use IMS, it never had any basis for concluding that IMS understood the scope of the work, had the requisite personnel, and could actually perform the work in the amount of time specified, and that it understood what material costs, et cetera, et cetera, would actually be involved. My recollection was that the conversation in question was Mr. Mercier preceded any proposal. That was the essence of the conversation was Mr. Mercier saying to IMS, you know, we understand you've been looking for some arrangement. Here's a possible opportunity for you, but you've got to use B&V. My recollection of the record may be faulty, Your Honor. I remembered that that series of events was different. But I think that's critical to the answer to Judge Prost's question. Because then if the testimony stands and there is nothing to rebut it, then on what basis is it proper even under our heightened standard to conclude that the Board's decision is correct? Well, the Board's decision was based on more than that one conclusion. And the fact that the Board concluded, specifically concluded, made a finding of fact that IMS was not required to use B&V as a subcontractor. But on what basis? Where's the substantial evidence to support that if the only evidence, if you're wrong about the timeline, and the only evidence was Mr. Singh saying he said this and demonstrating there was a record of the phone call and nothing else, where is the evidence to support the contrary finding? But the evidence that Mr. Singh put in was his statement that there was a phone conversation and the fact that the phone conversation took place. But it still doesn't establish what was said. Well, he testified as to what was said under oath. And that was the only testimony. And I don't think the Board said in this instance he testified and he didn't believe. We found him not to be credible. I think they found that there was no corroboration. I don't understand what kind of corroboration is necessary when you've got uncontroverted testimony of something. Right, but the other evidence does not support Mr. Singh's statement. Other evidence in the record does not support Mr. Singh's statement that there was any requirement. That's it. That's the only... And where's that other evidence? I mean, I guess that's what I'm asking. That's what I'm getting at. What is the other evidence to support the fact that Mr. Mercier didn't say that? Clearly, there's no specific evidence that that conversation was about something else. What I'm suggesting is that the overall... the rest of the evidence does not support that conclusion. There just isn't any reason to believe that that's the case, that there was a requirement. What items of the other evidence lead you to have that view, Counselor? You said if you look at the overall evidence, you'll appreciate the fact that there is a possible second meaning to the conversation. Give me the exact data points of the additional information that you believe answers the question that my two colleagues have been pressing you on. That the one phone call is not... doesn't... Well, you said that the one phone call doesn't make the whole day, but now you've got to find some testimony somewhere in the record that makes the day for you. I think you know what we're talking about, right? Yes, Your Honor, but I think I may be... You said if you appreciate the entirety of all the evidence, sir, you'll know that we're right. And I'm just saying to you, get specific. Give me some line items here of evidence that support your point of view. Mr. Singh's... You don't have any, you can say it, you know? Mr. Singh's claim is that he was improperly terminated from the delivery order or was never properly awarded to him because he was required to use a subcontractor that he didn't want to use or couldn't bring himself to use or couldn't have come to agreement with. And the fact of the matter is that isn't why he wasn't awarded the contract. So it's a red herring. I think that's your saying. You're saying he doesn't have a bad faith. Yes, I mean that does not... But you're really trying to say that whatever went on in that conversation, either way it doesn't go to a bad faith motive for disposing of them. That's correct. It disposes of them for some other reason, so it was harmless error. Yes, if it was even that, yes. But, I mean, the reason that Mr. Singh was not awarded, couldn't have been awarded this delivery order was he failed to fulfill the terms. I mean, his original proposal was that B&B would be used, and he can say it's because he was told to use them or maybe they're just someone he thought, a company that would be a good subcontractor, but nevertheless he was unable to come to terms with them, and then following that his suggestion that he would just do the work himself was never supported by any sensible cost proposal that gave the government, any assurance that IMS fully understood the work, and that is a completely... Is there anything wrong with the government saying we want you to use a specific subcontractor in this contract program? I think that... And that's a yes, you can answer that question yes or no, I mean... Is there any... The contracting officer says, well, fine, we're happy to have you as the prime, but if you want this contract, you've got to use B&B. Would that be a breach of law or offend the law if the government took that position? No, I don't think it would. Doesn't that play to your... Back to what seems to be your point now, which is this is a red herring, this issue about whether or not the government was insisting on B&B? Yes, that's correct, Joanna, and the overall evidence supports the conclusion that IMS engineers didn't submit sufficient information to the government to justify an award of the delivery order to it. Are you saying that a contractor does not have the freedom to select his or her own subcontractor without interference or requirement by the government? No, Joanna, I'm suggesting that if a contractor was unsure of who to use, I think that the government could make suggestions here. My question is whether or not the government could demand, not suggest. My question was, is it okay for the government to say, fine, you want this contract, guess what? Use the Clevenger Company as your sub, otherwise you don't get it. And when I asked you that question, whether that was permissible for the government to do so, you said yes. Yes. Which led to the presiding judge's question to the question, do you really mean that? And I'm not sure we have yet to get it. I'm not as familiar with this program as you are. Is there authority somewhere in the whole set-aside program that says when the government wants to pick the sub, it can? No, I don't believe it says that. I don't think there's anything that speaks to it. And I could imagine easily a circumstance where being directed to use a particular subcontractor could be problematic. What circumstances? There could be impermissible reasons for directing the work. If it was the contracting officer's brother-in-law's company or something. Or there could be some protected class issues. I mean, if that could be, it's not hard to foresee that that could be. But absent any such impermissible motive in having the government select the sub, you say if the government wants to pick the sub, it can. And what I've seen in these previous cases of this kind is that there's a series of subs that are basically capable. It started off that there were a series of subs who performed the whole contract, and you'd have just a paper general contractor. And then they said, no, no, no, the general's got to do a major part of the work. Right, right. And that was an issue here, too. But the government has always, I mean, if, for example, take a contract that has some highly sophisticated problems with it, like, for example, installing the sound and light and electronic system in this courtroom, we used a set-aside contractor, I believe. Do you think the government could actually pick which electrical contractor they wanted the prime to use? Could they actually require, you know, you're not getting the contract unless you use ABC electricians. Probably not. That probably would be that. So then we are back to Mr. Singh's testimony about this telephone call with Mr. Mercier. And I suppose your response to the question posed by Judge Prost early on as to what evidence is there, what substantial evidence is there, the board looked to the subsequent telephone call with Mr. Lindbrunner. The board's opinion says Mr. Singh's allegation is inconsistent with his subsequent call to Mr. Lindbrunner requesting the names of potential subcontractors. In other words, why would Mr. Singh inquire about the names of other potential subcontractors if he had already been compelled by the government to use B&B? Isn't that the answer to Judge Prost's question? Yes, although I think he contests that Mr. Singh contests that that conversation took place. I don't know that he agrees that he ever asked for additional subcontractors. Yes, but at least on that point you have some evidence on the other side. Yes, yes. Could I get back to another one of Judge Lind's questions on direct, which was the Miss Overgaard's testimony? Yes. And you know the pages that the other side referred to. Why isn't that sufficient? I mean, they had a signed – she acknowledged they had a signed task order, right? On the basis of the original proposal proposing to use B&B. That was the basis on which the delivery order was originally awarded. Oh, okay. So you're saying all of that just – that was no longer in effect then? Well, it was IMS's inability to come to terms with B&B. That's what led to the further negotiations that you discussed with the Appellant's Council earlier and the cost proposal issue. So you're saying the testimony on pages 318 and 319 with regard to an agreement was with reference to the original agreement between IMS and B&B? That was the – the delivery order was originally awarded to IMS based on accepting the proposal that IMS submitted, suggesting that it would – stating that it would use B&B as the subcontractor. And you're saying this testimony does not go to the further discussions that took place after the arrangement with B&B sort of fell aside where there was a discussion about IMS doing the work itself? No. I'm sorry. Maybe I misunderstood Judge Proh's question. The contract was – the delivery order was originally awarded on that basis. So to say – I understood you, I guess, to be asking whether the contract – whether the delivery order was awarded, suppose that we had an agreement based on the later negotiations. I think that that is not what she meant. But what is she – then what is the reference on 318? She said, we definitely came to an agreement or there never would have been a second task order signed. So where was the – is delivery order the same thing as a task order? Yes. So we're talking about the second one being signed. Do you know what the first one was and what the second one was? Was the second one you're still talking about the original B&B one? No, that would be the first one. That would be the first. So what's the second one that she said? But she also says we never really – earlier in that testimony, it was read out – she's not unequivocal that there was an agreement. She says there was, and then she said, well, we never really did resolve all the issues. Well, unequivocal, she says we definitely came to an agreement. I mean, that sounds pretty unequivocal today. But not in the context of her other remarks there. So can you – What other remarks are you referring to? I don't have it in front of me, Your Honor. I was remembering what Your Honor had read out. You don't have the appendix? I don't. You don't have the appendix? Didn't bring it to argument? I'm afraid not, Your Honor. Well, that's not very helpful to us. Well, all right. Any more questions? No. All right. Thank you. We'll hear from Mr. Camardo. Rebuttal? I just want to get back to a point about this direction to use a subcontractor. You know, my response to the court's question is basically twofold. The government cannot direct a contractor to use a specific contractor. Better yet, you're in an 8A program. There are stringent requirements that you can't exceed the 50 percent limitation cost. The government is well aware of that, okay? Better yet, they wanted B&V to be utilized, okay, knowing that B&V would be doing well over 50 percent. And therein lies the problem because the contract basically says that any subcontractors have to be approved by the government. But your problem is a position you're taking here is undermined by the evidence you put on it that was at trial. Firstly, Mr. Singh did come in and ask for a list of contractors, right? So that kind of calls into question the allegation that he was required in no uncertain terms to just use B&V, right? He denies that, Your Honor. But somebody else testified and the board is free to make a credibility determination. Okay, so there's some evidence. But then again, Mr. Singh, IMS put their phone records into evidence showing the phone call was not made. Yeah, but the board is – I mean, that was a question of credibility. They can – let me ask you a second part of that question because I don't think we're going to necessarily resolve that point here. And that is that if that were the case and Mr. Singh thought his way to get the contract in no uncertain terms was absolutely positively to only use B&V, then why most of this case is about him coming in and making an offer that didn't use B&V? I mean, why would he have gone through if his belief, firm belief, was that the government was in no way, shape, or form going to accept anybody other than B&V, then why would he have gone through this whole other scenario of saying no B&V, I'm giving you an offer, and then he's alleging that he believes that the government accepted it? Well, if he believed the government would never accept anyone other than B&V, how could he have necessarily assumed he had agreement with the government without B&V? Well, because, don't forget, there's testimony there he tried to resolve this with B&V, okay? B&V was making all kinds of demands. I think there's even a fact sheet saying in there that when he faxed the documentation over to the small disadvantaged office, Mr. Carter, basically – Okay, so what is the point of that? So what you're saying is that the government only required that he use B&V unless he had a problem with B&V? No, the government wanted – there's absolutely no – I mean, the record is pretty clear. March Air Force Base wanted B&V. Okay, well, is there a difference in your view between wanting what they want and what they require an 8A contractor to have? Isn't there a legal distinction between what they want and what they require? They also wanted to satisfy – okay, because they fell way behind in the 8A program requirements, and they wanted to satisfy their goals, and they thought one way of satisfying their goals under this 8A program to get their goals up would be to give the work to IMS and funnel 92% to 93% of their work over to B&V. B&V was at the site, okay? B&V had done some preliminary design work. They wanted to – even Mr. Limbrunner in his document says they wanted to continue, have some sort of continuity of the design work. So there's no doubt, okay, from all of the evidence there, okay, that the government wanted B&V. They wanted to use Mr. Singh as a conduit, which is – But is there a – there's a difference, is there not, between what the government indicates that they want and what they require? Isn't there a distinction? Well, when you have an IDIQ contract, Your Honor, with all due respect, okay, an IDIQ contract means the government can do anything they want. They can give you any work they want or they can not give you any work as long as they meet the minimum threshold of the $2,500. So if they're coming to you and they're saying that if you want some more work, then you better utilize B&V, it would only be logical, okay, that a disadvantaged contractor would do what the government wanted in hopes to even get more work because don't forget there was more work left to be gotten under that program. So he's not going to tell the government, no, I'm not going to do that and risk never getting any more work whatsoever under that contract. That's exactly what he did. He told them he wasn't going to use B&V, right. Well, when – a couple of things happened there. He went ahead, submitted the B&V proposal, directed to use B&V, submitted the B&V proposal. Then he had trouble negotiating, okay, the work with B&V. They were making all kinds of demands on him only because they thought they had him hostage. Number two, Mr. Carter got involved in this thing, okay. There's evidence of Mr. Carter working for a small disadvantaged and then basically they got wind of it. Now the government kind of reverse-coursed Miss Overgaard and they said, okay, we will negotiate with you to do the work by yourself. So the evidence, again, points that there was a problem. And that problem surfaced from both Mr. Carter, okay, and with Miss Overgaard saying subsequent to that, okay, well, yeah, we'll let you do all of the work now. All right, Mr. Carter, I think we have your point. And I thank both counsel. The case is submitted. We'll next hear your argument in docket number 2,000.